The matter of Bland versus the City of Newark at OWL. We know that the argument, you may all be seated, thank you, that the time for argument has been divided on both sides to allow addressing the rule 702 issue that is in this case. We begin though by hearing from counsel for the state defendants, Mr. Walters. Good morning, Michael Walters, Assistant Attorney General on behalf of the New Jersey State Trooper Defendants. I would like to request two minutes of rebuttal time. Mr. Walters, I begin with a rather unusual request because we always have read the briefs and are familiar with the facts and therefore don't inquire this way very often but given the fact-bound nature of reasonable misinquiries of this kind and given the kind of sequential events that transpire here, it would be helpful to me in any event, it might even be helpful to some of the questioning as to the constitutional issues here for you to take us through the actual chase because the chase, as I mentioned, has certain sequencing to it and certain locations where events occurred so it would be helpful to me in any event to hear about that and to hear what officers were at each of these places. Okay, certainly, Your Honor. So I'll begin with Sergeant Murphy and Sergeant Thompson. They were the first officers to spot the ALDI and that was within the city of Newark. As they approached the ALDI, then the pursuit begins. And timing-wise, they're noticing the ALDI occurred, what, approximately three hours after the ALDI had been stolen by someone who had a firearm? Correct. So then there is a pursuit throughout the city of Newark, it's a few minutes and then at some point Sergeant Thompson and Sergeant Murphy, they lose sight of the ALDI and then an officer from the city of Summit picks up the ALDI on the highway, it was I-78. At that point, the pursuit resumes with the city of Summit pursuing the ALDI. At that point, there is a state trooper on I-78, it's Trooper Oliveira, so he does witness part of that pursuit, and this is part of the pursuit of the city of Summit that is on one of the videos. As the ALDI then takes an exit into the city of Newark, at that point you can see again on the city of Summit's video, Trooper Holden, Trooper Sardinopoli, and Trooper Riefler are in their car actually at the exit that the ALDI takes in, you can see, then they join the pursuit. At this point, the pursuit resumes through the city of Newark and ultimately it heads to what I'll call the Lincoln Park location. So there's an encounter at Lincoln Park? Yes. And who were the officers involved in that encounter at Lincoln Park and what does the Okay, so I'll start with the officers that discharged their weapon, it is Trooper Sardinopoli, Trooper Espinoza, Trooper Oliveira, Sergeant Thompson, and Trooper Legg. And so on the video, I think that's the easiest way to explain it, is as the ALDI's coming down the street and it makes a turn, you'll see... The ALDI's coming down the street going the wrong direction in a one-way. And you can see the headlights are out as it's turning the corner. A vehicle goes by, then the second trooper car that goes by kind of swerves, misses the ALDI, and then it's the next trooper car which is driven by Sergeants Murphy and Thompson, the ALDI sideswipes that, and then it collides with the city of Newark police vehicle. And also, it involves a collision with a parked car. And yes, and it turns into there is a civilian parked car that is right there. At that point, Sergeant Murphy and Sergeant Thompson, they exit their vehicles, they approach the passenger window, a city of Newark officer is also at the passenger window, and one of the officers comes around to the driver's side window. At the same time that they are yelling commands and confronting the ALDI, you can see that the state police vehicle, unmarked vehicle, that's driven by Trooper Holdwin and Trooper Sarnopoli and Trooper Riefler, they're all passengers, that comes up and that parks behind Sergeant Murphy and Sergeant Thompson's vehicle. And at the same time, at this time, Trooper Oliveira, who was ahead of Sergeant Murphy and Sergeant Thompson, he has done a U-turn and he's come back, so he's at the scene and they're beginning to exit. It's at this point when the ALDI begins to drive in reverse and it collides with Sergeant Thompson and Sergeant Murphy's vehicle, and then you see Troopers Holdwin, Sarnopoli and Riefler, they're getting out of the way because their car is right behind the car that it's collided with. And at this point, this is when the ALDI goes forward and then you'll see at one point, Sergeant Murphy and Sergeant Thompson, they have to get over to the right. Then at this point, on the other side of the camera, Trooper Legg has come onto the scene and so has Trooper Espinoza. So as the ALDI begins to go forward and it goes across Lincoln Park, you have Trooper Legg is the closest one to him. You can see ALDI come to him and then the ALDI makes a right and avoids Trooper Legg. The ALDI then drives through the park. Goes through the park. Correct. Please put eight more minutes back on the clock, if you would, please. At this point, the pursuit resumes and eventually it gets to 18th and Livingston. I think I'm kind of estimating here, but I don't think it was more than three to five minutes after the ALDI cuts through Lincoln Park that it ends up at 18th and Livingston. And at this point, the ALDI, there is some dispute as to exactly how the ALDI crashes into the scaffolding that's surrounding a school building. That does not appear anywhere on video. We don't see on any of the video the ALDI crashing into the scaffolding. You do not see the crash. You can see for maybe a second or two on the 725 vehicle, which is coming up to the scene. You can see actually on the left hand side, you can see the unmarked police vehicle in and the ALDI, you can see it for a split second, crashed into the building and then that car goes beyond the scene and all you can do is all you have is audio at that point. So then you have Trooper Riefler and Trooper Holowin approach the dryer side window of the ALDI. Trooper Sardinopoli goes to the passenger side of the ALDI, this is at 18th and Livingston, and Trooper Lay arrives on the scene. He's right behind him. He's on the passenger side. Trooper Holowin is the trooper closest to the dryer side window door. At this point, he shouts commands to Mr. Bland to don't move, don't move. And they both have their weapons drawn. Trooper Holowin, his testimony is that the window is out or down at this point. He reaches into that first and Mr. Bland is somewhat unresponsive. He reaches in and then it seems that Mr. Bland comes to and he seems to Mr. Bland's making movements. He's not complying with the commands. And then Mr. Bland threatens Trooper Holowin, at which point Trooper Holowin begins to discharge his weapon and as does Trooper Riefler and Trooper Lay. This is what we call the first volley of shots at 18th and Livingston. After that, Trooper Holowin goes back. He goes through his clip. He falls back. Trooper Riefler then moves forward. He's closest to the alley. There is approximately 40 seconds between the first volley and the second volley of shots. At this point, Trooper Riefler is shouting commands to Mr. Bland to show his hands. By this point, Trooper Espinoza has arrived on the scene and he goes over to the passenger side. You can hear the first volley as Trooper Espinoza is arriving on the scene. Then Trooper Riefler sees that Mr. Bland again begins to is swearing and saying, I'm going to kill you. And then he Mr. Bland begins to his head and torso rises up sort of through through the window. And at that point, Trooper Riefler begins to discharge his weapon. Counselor, so I could not find any specific testimony about when or how the window falls out. All we know is that it's on the ground with a slug in it. But none of the depositions appear to speak specifically about how or when it got there. Correct. That is correct. What we what we do know is that Mr. Bland was pulled through through the window. So it was certainly out after the second volley. We know that there is testimony from all the troopers at the window. We either say it was out or it was down when they arrived before the first volley. And then there is a photo of the window. So, you know, there is a dispute. I don't think it's a slug in it. I think it's a shell casing that fell down that is sitting on it. And I think that is the window came down. It's not surprising. The shell case is on there. Our position is that it's it's really immaterial whether the window was up or down. We'll get to that. But once one thing or a couple of things you have not touched on yet factually go to the factual disputes that the district court maintains stood in the way of her granting qualified immunity here. And that is that at this point with the Audi in what appeared to be a disabled condition, something took place allegedly with respect to the engine racing and from which it would still be operable. And when did that occur? So that would be before the first volley when Trooper Holwin and Trooper Riefler appear on the scene, they say as as they are walking up, they can hear the engine engine racing or revving. It almost sounds like trying to get the car into gear. There is also testimony that the engine continued to race during the 40 seconds in between the first and second volley, as well as leading up to the second volley. All right. So let's let's talk about the factual disputes, the questions of material fact that the district judge found here to exist and to preclude the application of qualified immunity. Obviously, you don't think that there were such factual questions or that if they existed, they weren't material. Will you explain your position with respect to both? Sure. And I'll take the revving of the engine first. If we were to assume that the Audi was inoperable and its engine could not run. You still have a situation and viewing this from the troopers on the ground with the knowledge that they knew. They reasonably believe at this point and throughout this entire time that Mr. Bland was armed. They also knew him to be very dangerous at this point, considering between the flight and several of the maneuvers, running red lights, driving with his headlights off. So they reasonably believe him or they knew him to be dangerous. They knew that he was undeterred by their shots minutes earlier at Lincoln Park. So with that knowledge, Trooper Holguin knows that you have an armed, reasonably believed to be armed, dangerous individual who is in a car, who is, you know, is certainly poses. I think it's objectively reasonable and they have probable cause to believe that this suspect at this point poses a danger of serious injury to Trooper Holguin as well as the officers. Take the fact and assume that when the tinted window is up, Trooper Holguin is still aware of this information. Now you have a situation where Trooper Holguin is completely exposed as he's approaching the municipality while Mr. Bland, again reasonably believed to be armed, has proven to be dangerous. He is undercover in the car and he's obscured by a tinted window. Trooper Holguin, whether the window is up, he's hearing Mr. Bland threatening him. At that point, it's objectively reasonable for Trooper Holguin to believe that Mr. Bland poses a threat. And even beyond the objective reasonableness, the Fourth Amendment analysis, there is no established law finding that deadly force under these circumstances violates the Fourth Amendment. I don't know that you have, have you argued that Pumhoff may be sufficiently close to this that it is clearly established in the other direction? Well, yes. I mean, so the district court actually relied on Pumhoff being a game set and match for your position. At least as to Lincoln Park. Absolutely. I think Pumhoff is, I think certainly Scott v. Harris is as well, and certainly Brousseau v. Holguin. In that case, all three of them, as well as this court's decision in Davenport, as to Lincoln Park, I think it's very clear that it was objectively reasonable. And I think it's an even stronger argument to us that there was no clearly established law demonstrating or finding that Mr. Bland did not pose a threat or finding that the use of deadly force violated the Fourth Amendment. Now you move forward to 18th and Livingston. District Court relied on Pumhoff. The thing I would point out is that case was decided three years after the events in this case. The other thing is there was no violation of the Fourth Amendment found in Pumhoff. And also, most importantly, the driver in Pumhoff was not reasonably believed to be armed, where Mr. Bland is reasonably believed to be armed. I think that's what sets this case apart from many of the other cases. Scott, I don't believe the driver was reasonably believed to be armed. I don't think the driver in Davenport was reasonably believed to be armed. Did all of the officers who discharged their weapons at Lincoln Park know that the alley that matched the description had been carjacked at Dunkley? Yes. Yes, it was over the radio. I know it was over the radio, but is it in the record that they were aware of it, that the shooters were aware of it? Yes, all of their statements. And I certainly will confirm if I'm wrong about that, but I'm almost certain all their statements say that they were aware that he was reasonably believed to be armed and had committed the carjacking. And even if there's any question as to whether he was the one that committed the carjacking, because it was hours later, I think once Sergeant Thompson and Sergeant Murphy approach him and he flees, then that gives them, I think the Supreme Court recently in Westby had stated that flight at the approach of the law enforcement officer is a strong indication of a guilty state of mind. So they all had a reasonable belief that he was involved in this. Now, circling back to Garner, Tennessee v. Garner, that case is very different than the facts here. Garner establishes that a law enforcement officer cannot use deadly force against a suspect who is believed to be unarmed and non-dangerous and fleeing on foot. Here, very different circumstances, reasonably believed to be armed, known to be dangerous, and fleeing within the vehicle. Thank you. We'll have you back. Mr. Lipschitz, on behalf of the Newark defendants. Thank you, Your Honor. Mr. Lipschitz. Yes, sir. Your clients stand on a different footing here. The state trooper stories have been very consistent. The city officers, however, relay that this Audi is launching backwards or ramming into the Chrysler in a way that is inconsistent with what the state troopers say. What, if any, inference should we draw from this inconsistency in their testimony? Thank you, Your Honor. I don't think there's much inference that you can draw respectfully. These are officers that are located surrounding the car at night, very loud noise. I don't know if the state troopers were asked in their statements, was the car moving? At least one of the Newark officers said he thought the car moved, he thought the car was jumping. Whether the car launched back, whether they're behind the car and it's their perspective that the car launched back, what is consistent throughout is that the car engine was revving, consistent through every state trooper, every Newark officer. But for the record, I will assume for the purposes, because this is a summary judgment, that the car did not launch backwards. We would concede that. I want to echo the thoughts. I actually want to add a few more points, Mr. Judge. There were a couple things that were missed in the recitation of facts. One, as the pursuit leaves Lincoln Park and is picked up by Thomas Del Moro in his, I think a Chevy Blazer, an unmarked Chevy Blazer, Mr. Bland collided with yet another state troop car. Then driving up 18th Avenue, clearly a very traumatic pursuit, because all these cars are traveling up 18th Avenue, lights and sirens, and then you come across this horrific, horrific car crash with Ms. Knowles and her vehicle. That too is depicted by the video. It is, but it's all part of the information here. You're right, Judge Bevis, my clients are different. They were briefed at roll call about an armed carjacking with a gunpoint, with a gun, so they were aware of it. They heard over the radio, and in the case of Del Moro, he actually saw a shooting at Lincoln Park, but the other two heard about it. Shots fired about the car that was carjacking gunpoint. This is a very substantial issue here. Then they get to Lincoln, then they get to 18th Avenue, and it's not disputed, my officers, we're not there for the first round of shooting at 18th Avenue. It is not disputed. They hear another round of gunfire. They come to the scene with two rounds of gunfire. Mayhem, destruction, cars left all over the place. They're stopping to render aid to Ms. Knowles, who they think is dead because her car shot up into the air. There are parked cars on the side of the road, littered. There's pieces of cars everywhere. This is a traumatic, dangerous, utterly ridiculous police pursuit, and my officers came into that situation, and they heard running of the engine, all of them. And there's no one who said otherwise. There's no one. That's the most remarkable thing in my mind. There's no one who said that the car wasn't revving. But Mr. Bland never gave up. There's nothing in the record that said he attempted to surrender, that he attempted to comply with any orders of the police, that he ever gave up. So is the revving consistent with what the, assume that the auto expert belongs in the case. Let's set that aside for the moment. Is the revving consistent with the testimony that the district court, was submitted to the district court in summary judgment? I don't know. Does the auto mechanic's opinion create a genuine issue of material fact as to whether there could possibly have been revving at this point? Well, obviously, you read my brief, and my feeling is that it doesn't. It's pure speculation. That's my feeling. I mean, how do you? Well, assume that it's not. Assume that that's in the case. Then we've got a material issue of fact and dispute about the revving. So let's assume that the car was not revving. Let's go to the next inquiry, which is, do the officers have a right to discharge their firearms in that scenario with the car having been disabled and not revving? Who knows that? Who knows that? Well, how does that help you? You're saying if the answer to my question is indeterminate, you prevail because of the qualified immunity legal standard? Is that your point? Yes. But is that your point? I'm not sure I get your point. My point is whether you accept that the car was revving or not revving. Well, I'm asking you to believe it's not. I want you to assume that because we have to view the record in the light most favorable to the plaintiff that the car is disabled at the time the final volleys of shots are fired. It doesn't matter because Mr. Bland was not responding to the officer's command. Let me ask the question in a different way. Is it a material fact out of the inquiry here? Material dispute effect? No. Why not? I'm sorry I'm trying to answer that question, which is he had not yet given up and the officer still reasonably believed he was dangerous and armed with a weapon. He had not surrendered. This pursuit had not ended. This event had not ended. What if the report at the briefing your clients got was that an unarmed car theft had occurred? Well, I think that would... Do they have the right to shoot when the vehicle is disabled at the end of the chase? Well, that's respectfully speculative because in this case they knew... I'm asking... I know it's a hypothetical. I'm trying to ascertain what the limits of the law might be in this case. Well, if the Fourth Amendment is objectively reasonable in their circumstances, if they knew that he did not have a weapon, there might be an issue as to their discharge of a firearm use of deadly force. Your argument then is heavily dependent upon their reasonable belief, albeit ultimately erroneous belief, that Bland was armed at the time the car chase concluded. Yes, but how else could you... Excuse me. And the vehicle itself can qualify as a deadly weapon if the vehicle is reasonably believed to be capable of further movement. Oh, I think we could ask Shonda Nolton whether she thought it was a deadly weapon or not. I mean, whether or not he had a gun doesn't matter. He was in the car, the carjack car, and he didn't stop when the police came. They had every right... And he fled, and that pursuit through Summit on I-78, off the side roads, you can see it. He is passing cars on the interstate like they are stuck in Molasses. He is driving through red lights. He is driving on Freedom Heisen Avenue in Newark, which is a 25-mile-an-hour road going 80 miles an hour that police cars can't even keep up with him. He drives the wrong way down a one-way street. He strikes a police car. He strikes another car. He strikes a park car. He rams backwards. He drives through the park. He strikes a police car. He strikes Ms. Lowe's car. At some point, someone has to look at this and say, this guy's very dangerous. Well, you had a number of officers looking and pointing weapons who had made that determination quite clearly. And in a split second, in the deliberation of the courthouse that we have here, in seconds... I'm an old prosecutor who used to spend a lot of time with police officers, so I know exactly what you're referring to. Thank you very much, Mr. Schmertzen. Thank you, Judge. Is it Mr. Ventris or Ventrice? Ventrice. Ventrice. I think a broad day saved Ventrice. I appreciate the acknowledgement. I agree. Ladies and gentlemen of the court, counsel, I will get right to what I believe to be the issues before the court. The plaintiff, Mr. Bland, was not actually struck by any of the bullets until what we've called the terminus, after he collided with the scaffolding at the terminus at 16th Avenue. The terminus and the scaffolding had been used interchangeably by parties and by so I'll just refer to it as the terminus from this point forward. But how did we get to that point? We've heard about Lincoln Park. We've heard about the other points. But at the terminus, we have Trooper Holden explaining that he was directly behind the Audi in the Sunmark Chrysler, and he ran the Audi into the scaffolding, and he specifically explained, and then I pinned him in so he wouldn't move. So we then have Troopers Holden, Simonopoli, and Roeffler exit the Chrysler while the Audi was already in the scaffolding, and then they start firing upon him. Counselor, the video at Lincoln Park shows very clearly the vehicle launching back at a high rate of speed and ramming, I believe it was the Chrysler. So he's gotten himself out of being boxed in before, and some of those officers were heard about it on the radio, so they could reasonably fear that would happen again. Well, there is a big difference. He had hit a car at that point. In this case, he was pushed into scaffolding. Chrysler was almost right up against it. But what's most telling is when you're asking, what did these officers observe? Because we have to look at it from the standpoint of the officers. What did they observe? We have photographs. We have photographs A605, 606, and 607. And what these photographs show, it shows a view of the Audi from the left side, a view from the right side, and it shows the Audi and the Chrysler almost right up against each other. That's what the officers saw, because you had some of the officers approaching from the right side, some approaching from the left. Let me stop you right there on the general issue of what the officers saw. Did you not, before the district court, take the position factually that the officers had a clear view of Mr. Bland, and that without seeing his hands or a gun began shooting him? Didn't you say that before? I don't know if all the officers had a clear view of that, but I believe some of the troopers said that they had a clear view of Mr. Bland. In the car? As they approached the vehicle, they had a vehicle, because you heard some of the troopers came up right to the window, and they were able to look into the vehicle. So at that point, they certainly could look into the vehicle. No one said they saw a gun. No one saw a gun at that point at all. Do they have to see a gun? Well, at some point. They may have seen a gun, and the reason I ask that is that it sounds like when you say they didn't see the gun, the inference I'm drawing is this. That if Mr. Bland had raised the gun in the air and pointed at them, you would conclude that yes, okay, they had a right to shoot him, right? Yes. But if the gun were in the console or in his lap, would not have been visible, they don't have a right to shoot him. Is that your argument? No. What I'm saying is in this particular case, they did not see a gun in either of those places. They didn't see it in his lap. Obviously, they wouldn't see it if it was in the console. I guess let me ask it a different way. Just because they don't see the gun, in your view, means that they have to conclude that he doesn't have a gun at the ready and pose an imminent threat. I'm saying that's one of the factors to consider. Another factor is that he's yelling, I'm upset that he's going to kill you repeatedly. I think you can look at the totality of the situation and consider what these officers said they relied upon and whether that even occurred to determine whether or not there are factual issues here. Is there anything in the record that contradicts that he is yelling threats to kill the officers? There's not, other than the general credibility issues, which I submit are directly in point here. Because when you have these officers saying, we were afraid that this car was going to launch back at us. And you look at these photographs, the photographs show a large piece of the scaffolding embedded into the right vehicle. They had already or some of them had already witnessed the vehicle at Lincoln Park launch backwards, right? Yes. But at that point, there was nothing holding that vehicle in place. If you look at this picture in A605. In the age of the moment with adrenaline running, you expect the officers to have been analyzing the physical capabilities of the vehicle. I'm suggesting that this part of the case, this is an issue for the jury. Because it's not like I'm just pointing to one little aspect of the vehicle and saying, well, taking this by itself, this vehicle couldn't move. You have the scaffolding stuck into the wheel, which is sideways. So the axle must be cracked. You have the tire on that wheel off and on its side. On the left side, you've got the chassis sitting on the sidewalk. You've got fluid all around it. Then you have the Chrysler right up against it. And then you have these troopers saying, well, we had to shoot at them because we heard the engine rev. And yes, we do have an unrebutted automobile mechanical expert to say that the engine could not have revved that far. Mr. Ventris, what Supreme Court decision is factually most similar to your case? Well, what I would submit is we do not have a situation where we need to point to a specific precedent. I would submit that if you consider the facts in your case. Does that mean that you lack such authority to support your position? No, I do not. I'm suggesting that considering these facts, and the light was favorable to the plaintiff, you have an unarmed man sitting in a vehicle that is inoperable that could not move backwards. The pursuit had ended at that point. Let me just cut you off for a minute because I want to make sure we're agreeing on what the law is here. I think where you're headed is perhaps going to make a persuasive argument that a violation occurred here. A constitutional deprivation occurred. I'm granting you that for purposes of my question. Because as I understand the law, that doesn't help you survive qualified immunity. You need to show clearly established law. Right. You show that, but you do cases that address this. And if you agree that you must show clearly established law, my question to you, the reason I asked you which Supreme Court case is most like yours was because I'm curious to know what the clearly established law was in 2011 when this occurred that put the police and the troopers, etc., on notice that they were violating the Constitution. I would submit this is one of the more obvious nature of a Fourth Amendment violation for a sex of force. So your answer is there's no case, but it's obvious? It's obvious based on... I thought your answer was going to be the cases Tennessee v. Garner, because that's in your brief. Garner and, excuse me, both cases. Garner and Graham also stand for this proposition of general excessive force being violations of the Fourth Amendment. That's what concerns me. The use of general. The Supreme Court has repeatedly admonished the courts of appeals, usually reversing the courts of appeals, at considering these cases at, quote, too high a level of generality. I agree there have been cases on that level. When you say it's a general misuse of force, that seems to go right to that issue of the mistake that the Supreme Court has been correcting us on for years. But in those cases, the Supreme Court will state, usually after a somewhat unique fact pattern, the Supreme Court will say, this is not of the obvious type of Fourth Amendment violations that do not meet a specific precedent. For example, the Plum Halls decision. There, the pursuit was still in progress. I believe that is a factual issue for the jury to determine whether the pursuit was still in progress. If the pursuit terminated, the cases that are relied upon by the defendants don't apply because we do not have a pursuit in process. The burden is on you. I thought your answer to Judge Hardiman was going to be that Plum Hall, et cetera, are cases involving a deadly weapon, either a car that can still move or a gun. And if you can get the car and the gun out, you can kind of make this case look more like Tennessee v. Garner. You still have the problem that he's shouting death threats, and Garner is not shouting death threats. But it's at least plausible. But it's very hard to say that the gun is not plausible at issue, even if you can knock out the car. Well, as far as the gun goes, you have to look at what the explanations these officers gave for why they did what they did. They didn't even focus on the gun. But it's not a subjective test. It's an objective test. Well, but if they're telling everyone, the reason we did this is because the car was revving, and if Newark is saying the reason we did this... Is that really the legal analysis, though? What if the police officer's testimony is, I have no idea what I was doing. I'm a rookie, and I was in the fog of war. That doesn't matter for our analysis, right? Because our analysis is to ask the question of whether the reasonable officer... And this cuts both ways. Sometimes it helps the plaintiff. Sometimes it hurts the plaintiff. Yes. Whether the reasonable officer would have done what happened, right? But to consider the reasonable officer, you need to consider the explanations that have been given. And the explanations that have been given focused upon the vehicle lurching backwards. You had every Newark officer saying, that's why we shot, because we said... So that's why I was asking you to judge Mevis' question. That's why I was asking you about the gun.  I'm willing to grant you... I think it's a disputed point, but I'm willing to grant you that the car was disabled. Just because someone takes someone on a high-speed chase and is putting the public at risk of death, etc., etc., it doesn't mean that at the terminus of that chase, the officers have a right to come up and just kill somebody. If that person is plainly not posing any threat, they don't have a right to do that. And that's what I'm talking about. Here, we've got a gun, supposedly, and the death threats that Chuck Bevis mentioned. So how do you help us get over those? We also have the officers being up close to the vehicle, to the Audi, saying that they were able to look and never seen a gunshot. We also have, at no point during this entire pursuit did a gunshot ever come from Mr. Did the officers do what they do? I think you can consider whether what they said is credible, and that's where we get to what are the factual issues here. Getting back to what the Newark police officer said, they gave as an explanation something that we know to be patently false, that the Audi lurched backwards and that troopers scattered. That didn't happen. No trooper said that. The troopers were very clear. We ran the vehicle into the scaffolding. Then you have Newark saying this. But then we're expected to believe Newark when they say, well, one of the reasons might have been that he had a gun. Well, they're kind of grasping at that point, because they know that that defense is not working anymore, because they have the troopers contradicting them. So now we're going to go with the fact that he had a gun, even though some of these officers were right up close looking into the window. And then we also have the fact that this window, fully tinted, was still intact, and there was a .40 caliber slug. It wasn't a shell casing. This is the first I'm hearing that. The ballistics report called it a .40 caliber slug. But if the window was up, then again, you're saying, well, did they see into the vehicle? Did they not see into the vehicle? It sounds like they really were making it up as they were going along, giving the defense to what they did. If the window was up, the vehicles on the, the individuals on the- We can't discover anything. That window, he could have hit the scaffolding. The window falls out right then, whether it's a slug that was embedded from Lincoln Park or whatever. We don't know anything that comes- I don't see a genuine issue of material factor with a window. Only thing you've got is the revving. Right. Well, we also have whether or not it was reasonable for them to believe that there was a gun in the car after looking into the car, being up close to the car. You had some officers saying they were right at point blank range, right next to the driver's window. You had one officer saying he's reaching out of the vehicle, lifting his torso and his head out. You have another officer saying he's fiddling around, moving around inside the vehicle. Then you have these other officers saying his foot must be on the gas if he's revving the car. He's doing all three of these things at the same time. I think you can conclude that these are factual issues as to what happened and why these officers did what they did. All right. Thank you very much, Mr. Davis. Mr. Phillips. May it please the court. Good morning, counsel. I came prepared to address the Daubert matter, but I wanted to address some facts that I think are important that are of obvious concern to some of the court. It's undisputed. It is the ballistics analysis that the item that's embedded in the window, which is almost fully intact at the base of the passenger side of the Audi with blood on it, is a .40 caliber slug. The significance of that is that the troopers and the Newark officers carry the same kind of same weapon brand, but they carry different calibers. Only the Newark officers had .40 caliber six hours. All the state troopers were handling nine millimeter six hours. None of the Newark officers shot at Lincoln Park. So it is not possible for that slug to have been embedded in the window as it was leaving Lincoln Park. That also disputes the argument by counsel Lipschitz that the Newark officers all arrived after the volleys had started because the statements given by Martinez and Torres, who came up during the chase, which Del Niro was in, indicated that they witnessed, as counsel just said, the Audi leap back, chase the officers, the troopers, out of the back of that. And that's when they fired. And they also make alleged observations of Mr. Bland through that window. It's not physically possible, physics wise, for them to have made those observations and have shot and embedded a slug in the window that was clearly up and intact at the time that occurred. That, I think, belies some of the issues that were concerned by Justice Weiss. They stopped. They were there in the beginning. They shot. And it's clearly that the Newark officers were doing that because of the different caliber in the weapons that were used. We can accept that. Thank you for that clarification. But how does that help persuade us that it was unreasonable for the officers to believe that at the time the shooting occurred at the terminus that Mr. Bland was armed? Well, especially in light of the death threats. Well, what I just suggested to you, I think, basically a plaintiff's case here argues that none of the troopers, nor the Newark police officers' versions of what occurred there is actually accurate and factual to the extent that justifying the shooting. As counsel indicated, they kind of went through it, came up as they went along with the process. There is some indication in the record in the forensics analysis of the state police shooting squad that got there that there was some discussion of the vehicle lurching back. That's in one of the state police documents. Yeah, but I'm throwing that away. I'm assuming you're a winner on the vehicle. What about the gun? I mean, it's one of the most unfortunate parts of this case. They seem to have every reason in the world to believe Bland was armed, but Bland was not armed. Except for the fact that this occurs hours later than the alleged theft, which is we're not  I think it's not just that it's hours later. It's when the police come across them. There's this massive, dangerous, high-speed car chase involving hitting seven cars, flipping one of them over. Someone who has nothing to hide, officers reasonably think, isn't going to be driving 80 miles an hour down the wrong way, down the wrong lane. You put that together with the report of the gun, it's different from just being hours later of someone who innocently borrowed a car. Well, innocently borrowing a car, I think, is not what we have here. What we have here is the fact that Mr. Bland was related to the owners of the vehicle, and recognized the vehicle, and retrieved the vehicle. And it's clear without question that when the vehicle was carjacked, he was at work for the city of New Orleans. The question here is from an officer's perspective, this is an objective perspective. Whether that's right or not, that doesn't fit on what the officers reasonably believed or knew at the time. I was going to get to that. We're talking three hours later. Mr. Bland gave a deposition testimony. In Mr. Bland's deposition testimony, he indicated that his erratic operation of the vehicle and him running away from the police was predicated upon being shot at and wounded. That's in the record. And that from that point on, he was trying to avoid being shot at again, and trying to get to a location where he could get assistance for the wounds that he suffered. In fact, he described the wound that he suffered, too, in the arm and through one of his eyes. So that's in the record. And this is three hours later. Your co-counsel just said none of the bullets hit him until 18th and Livingston. And you're telling me that his whole chase is based on his trying to deal with injuries he suffered. Am I wrong that you're being inconsistent with his reading of the record? Not that. Part of the problem with Mr. Bland and his testimony, as is also in the record here, is that he suffered neurological damage from being shot in the head several times. So what we have here are false memories, memories that are a combination of certain things occurring, and a lack of memory. So it is clear that Mr. Bland's eye was shot out at some point in time. His rendition of what had happened doesn't necessarily have to be accurate. But his explanation for avoiding the police with respect to being concerned about being shot at is the fact that he put into the record through his deposition. So when you have somebody with the kind of neurological damage he has, he has false memories, he has a lack of memory, and he has partial memories. Mr. Bland does not recall in his deposition testimony being shot at when he ended up at the terminus, even though we know he was shot at some 60 times, and hit probably 18. Mr. Phillips, having elected to address this aspect of the case, you've used your entire allotted time and not reached the expert opinion issue. Now we'll give you some limited amount of time to do so, but it's up to you. The court below did not rely upon the Parinello opinion in order to determine its summary judgment determination. The Parinello argument and the in limini motion was addressed after the court decided the summary judgment motion. Mr. Parinello, through his life experience from high school on, has demonstrated expertise in the automotive mechanical area. From his high school degree to his work for General Motors, to his work where he currently works, where he supervises an operation, to his work with working for a specialized transmission. Let's assume he's qualified, right? The district judge didn't rely on this. But the problem I have is not that. It's that he says he didn't do enough examination of the car. There's a dispute about that. But the only thing he pronounces with certainty, I think, is that the axles couldn't be turning. He says likely the engine would have shut off. So I'm not sure that that's enough to defeat summary judgment, because it could still have been revving, even if the revving isn't able to do anything to the axles. If we grant you the maximalist reading the testimony. Right. I think the details of his opinion with respect to that are important. And it also goes to one of the factual, I think, disputes that is significant here, as to who did the same one. That's the Knowlton vehicle. And where the damage to the Audi occurred. Our expert has indicated that the damage to the Audi on the right passenger front end of the vehicle was so significant that after the collision that caused that damage, the Audi would have shut down from a computer standpoint within 10 to 15 seconds. Now, there's no question that the collision that would have caused that to down 18th Avenue in the direction of return to Boulevard. So the question is, which vehicle did it hit? Thus, the Sable is parked behind a Ford Focus. It is a Sable that is pulling out into the direction of traffic that is t-boned by a vehicle. Our expert has also indicated that the significant damage to the Chrysler chase car, and you can see it, the hood is basically bent at a right angle. The front end is leaking fluids. The radiator is cracked. That kind of damage did not occur from the Chrysler ramming into the rear of the Audi because you can see the rear of the Audi. The damage to the rear of the Audi is not significant. You've got some bumper indentations on either side. The damage to the Focus, which is literally in front of the Sable, is damaged in the rear, past driver's side rear location of the Focus, which is commensurate with the damage to the Audi. Mr. Bland testified, and I submit this is one of his recollections that he was accurate on, indicated that he saw that vehicle pulling out, meaning the Sable, and he was able to swerve to avoid that while he was being pushed in the rear by the Chrysler. Getting around that vehicle, that leads to the conclusion that it was a chase car, the Audi, not strike that, the Chrysler chase car that actually hit the Sable, and that the Audi hit the Focus, which was in front of the Sable. A significant factual issue here. Besides the fact of the window being up and all the other facts, what you have here is none of the officers were rendering versions of what occurred here that's actually factual in basis, and as indicated, that should be taken into consideration when you talk about the reasonableness of their actions. Thank you very much, Mr. Phillips. And we'll hear Mr. Wolbers in rebuttal. Carl, may I also beg his indulgence in court for one minute as well? I'd like to do that.  Thank you, Your Honor. Thank you. Unless the court has any questions, I'm going to wait my rebuttal time. In light of Mr. Wolbers' generosity, Mr. Lipschitz, the podium is yours. Thank you, Your Honor. We don't see that very often. No. Thank you. It's a great generosity. I only call it that. These people usually jealously guide their time. I only want to address one thing respectfully. The issue of the bullet slug in the window came up on the motion for summary judgment below. It was not briefed. There were no documents that were presented. I was prepared in a sense, and I had the evidence report with me that indicated, and we agree on one thing. The state troopers used 9mm, and the police officers used .40 caliber. But the evidence report clearly states that the fragment that's on that window is a 9mm slug. It is not a .40 caliber slug. Please don't take it from my word. All I want to do is submit as a supplement the evidence report. I do not want this court to get a representation that's incorrect. So I just want to make sure that's clear and beg the court to let me submit the evidence report, which was not part of the record on the summary judgment, having not been briefed. So that's all I want to say. One last thing. Judge Harmon, the plaintiffs did not answer your question. They did not identify any case. They spoke to great length about the subjective intentions of the officers, about whether they're believable or not, and of course, they didn't answer your question. They sidestepped that. They sidestepped it in the briefs, and they sidestepped it here. We don't look at what the subjective intentions of the officers are. We look to the objective factors, and we ask what is the case that what they're doing objectively is unlawful, and there is no case. And that's all I have to add. All right, Mr. Lipschitz. Thank you. We'll allow you to submit that, supplement the record or the appendix in the case, but we'll also permit the appellees to respond in any way they believe is appropriate, be it by memorandum or supplemental addition to the appendix. Thank you, Rory. Thank you. All right. We thank counsel for their helpful briefing and oral argument today. We'll take the matter under advisement, and we will ask the clerk to adjourn the proceedings. All rise. This court is adjourned until tomorrow, March 23, 2018, at 9.30 a.m.